**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
JOSHUA NEUMAN,

on behalf of himself
and all others similarly situated,

                                            Plaintiff,

                    -vs-

BLUE JAY TRANSIT INC. d/b/a BIRD;
BLUE JAY TRANSIT USFM LLC D/B/A BIRD;
NEUTRON HOLDINGS, INC. D/B/A LIME;
VEORIDE, INC. D/B/A VEO; and
CITY OF NEW YORK,
                                            Defendants.
------------------------------------------------------------------------X

**AMENDED CLASS ACTION COMPLAINT**

Civ. A. No. 1:24-cv-07430-AMD-LB

**JURY TRIAL DEMANDED**

      On behalf of himself and all plaintiffs similarly situated, Plaintiff, JOSHUA NEUMAN, by and through his attorney, JONATHAN E. NEUMAN, ESQ., respectfully alleges as follows:

## PRELIMINARY STATEMENT

1. This is a class action complaint brought on behalf of Plaintiff and all others similarly situated relating to the continuing public nuisance created and allowed to continue by Defendants.

## PARTIES

2. Plaintiff JOSHUA NEUMAN is an individual with an address in Queens, New York.

3. Defendant BLUE JAY TRANSIT INC. d/b/a BIRD is a Delaware corporation with a registered agent address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

Page **1** of **15**

4. Defendant BLUE JAY TRANSIT USFM LLC D/B/A BIRD ("BIRD") is a Delaware limited liability company with an address for service of process at 28 Liberty Street, New York, NY 10005.[1]

5. Defendant NEUTRON HOLDINGS, INC. D/B/A LIME ("LIME") is a Delaware corporation with an address for service of process at 99 Washington Avenue, Suite 805A, Albany, NY 12210.

6. Defendant VEORIDE, INC. D/B/A VEO ("VEO") is a Delaware corporation with an address for service of process at 80 State Street, Albany, NY 12207.[2]

7. Defendant CITY OF NEW YORK ("NYC") is a municipal corporation within the State of New York.

## DEFENDANTS' E-SCOOTER PROGRAM

8. Defendants BIRD, LIME, and VEO are all companies in the electronic scooter ("e-scooter") business.

9. In the first quarter of 2020, then Gov. Andrew Cuomo legalized the use of throttle-based bikes and e-scooters in the State of New York.

10. Thereafter, in July 2020, the New York City Council passed Local Law 72, which allowed the operation of e-scooters in New York City by removing local prohibitions on the operation of these devices.

---

[1] BIRD's user agreement lists "BLUE JAY TRANSIT INC. d/b/a BIRD" as the entity with which users contract. However, BLUE JAY TRANSIT INC. is not registered to do business in the State of New York. "BLUE JAY TRANSIT USFM LLC D/B/A BIRD" on the other hand, is registered to do business in the State of New York, as of July 12, 2024. Upon information and belief, Bird was previously owned by Bird Global Inc., headquartered in Miami, Florida, but after a Chapter 11 bankruptcy filing in which its assets were sold to Third Lane Mobility Inc., Bird reemerged under the names BLUE JAY TRANSIT INC. and BLUE JAY TRANSIT USFM LLC, along with other related entity names, with the use of the particular entity depending on the State in which it is operating. As stated, in New York, only BLUE JAY TRANSIT USFM LLC is registered to do business.
[2] BIRD, LIME, and VEO shall be collectively referred to herein as "E-Scooter Defendants."

11. Likewise, the New York City Council passed Local Law 74, which mandated the New York City Department of Transportation ("DOT") to establish a shared e-scooter pilot program that allows shared e-scooter organizations, determined by the DOT, to operate shared e-scooter systems.

12. The DOT is an agency of the Defendant NYC.

13. Local Law 74 **required** that "Any shared electric scooter organizations participating in such pilot program shall be required to have in place and implement a protocol to keep paths of travel, curb ramps, and other accessibility features unobstructed for people with disabilities."

14. Local Law 74 also required that prior to the completion of the pilot program, the DOT had to submit a report on the progress of the pilot program, which needed to include, at a minimum, a determination as to whether the DOT recommended the implementation of a permanent shared electric scooter program, along with any recommendations as to changes in the laws, rules, regulations and policies governing the use of such electric scooters, where appropriate.

15. In October 2020, DOT issued a call for e-scooter operators to declare their interest in participating in the pilot program, known formally as a Request for Expressions of Interest (RFEI), that led to the selection of three operators: Defendants BIRD, LIME, and VEO.

16. Pursuant to Local Law 74, in August 2021, the DOT launched a shared e-scooter pilot program in the East Bronx.

17. In the initial launch, there were up to 3,000 e-scooters, impacting a population of approximately 350,000 residents of the East Bronx.

18. The program was expanded in June 2022 to more locations in the East Bronx, and increased to up to 6,000 e-scooters, impacting an additional ~250,000 residents.

19. The e-scooters function under a pay-as-you-go model, with users paying $1 to unlock, and then an additional cost per every minute of use.[3]

20. In November 2022, the DOT issued a final report on the pilot program.

21. The report found that over 86,000 rider accounts completed over 1,000,000 trips in twelve months, with an average of over 2,800 trips per day.

22. However, the report found that during DOT inspections, 24 percent of all inspected e-scooters were improperly parked, with 10% of these instances being e-scooters that blocked the pedestrian path of travel.

23. Assuming that the DOT inspections were a representative sample of the entirety of the program, that would mean that there were over 240,000 improper parks of the e-scooters, and 100,000 instances of e-scooters blocking the pedestrian path of travel over the course of just 12 months.

24. There are two types of parking rules for shared e-scooters, which vary based on location within the service area: mandatory corral zones and free floating parking.

25. "Mandatory corral zones" are areas within the service area where users must park their shared e-scooter in a designated parking corral in order to end their trip.

26. These typically are used in dense, commercial corridors to minimize sidewalk clutter and allow the system to act more like docked scooter share.

27. Upon information and belief, 130 parking corrals were installed in the East Bronx over the two phases.

28. However, in the vast majority of the service area, riders can park their shared e-scooter in the "furniture zone" of the sidewalk.

---

[3] There is also a discounted pricing scheme, as mandated under Local Law 74.

Page **4** of **15**

29. The furniture zone of a sidewalk is the area at the edge of the sidewalk, adjacent to the roadbed, where the public typically finds benches, bus stops, tree pits, and parking signs. When parking in the furniture zone, users must not:

    a)    block the pedestrian path of travel, including pedestrian ramps;

    b)    block curb cuts or driveways;

    c)    park on private property or the roadbed.

30. These parking rules are communicated to riders via in-app training and to the larger community during outreach events, but otherwise not enforced.

31. Under their agreement with DOT/NYC, Defendants are responsible for all improperly parked e-scooters.

32. However, there are no penalties for users who do not park properly, and the Defendants do not monitor whether or not their e-scooters are parked properly.

33. Instead, community members in the impacted area have to alert the Defendants of improperly parked shared e-scooters by calling the customer service phone number on the vehicle, using the company's Community Reporting Tool in the app or on their website, or calling 311.

34. This requires impacted New York residents who are not familiar with the service to figure out the company and its contact information, or spend their time contacting 311, even assuming they would know to call 311, and then know the precise location otherwise 311 won't take the complaint.

35. This predictably leads to e-scooters being dumped in improper zones, in the street, and across the width of the sidewalk impeding the path for pedestrians, elderly, disabled, and others with limited mobility, for days or even weeks at a time, impeding the public's access to clean

and unobstructed streets and sidewalks, and putting homeowners and business owners at risk of liability in the event that somebody trips or is otherwise injured by an e-scooter improperly parked in front of their property (since under New York City law, property owners are liable for failing to keep the sidewalk in front of their property in a safe condition for pedestrians).

36. The ones that are the most impacted (i.e. elderly, disabled, and others with limited mobility) are those with the highest likelihood of a lack of knowledge of who to call to remedy the problem.

37. If no report is made, Defendants are not aware and do not endeavor to make themselves aware of improperly parked e-scooters.

38. Upon information and belief, during the pilot program, DOT received tens of thousands of complaints, and among non-riders, more than 50% of them complained to DOT about e-scooters blocking the right of way.

39. Since the launch of the service in August 2021 until May 2024, there were approximately 3.8 million trips among more than 157,000 unique user accounts in the Bronx.

40. Despite DOT's and E-Scooter Defendants' knowledge of the serious issues with improper parking of e-scooters, in June 2023, DOT announced that the service would be expanding to 20 square miles in East Queens, impacting approximately 600,000 Queens residents.

41. The program launched in Queens in or about June 2024.

42. Since then, there have been over 300,000 uses of the e-scooters in Queens.

43. However, the program has been rife with the same public nuisance that transpired in the Bronx.

44. Many e-scooter riders ride them on the sidewalk, where they are not permitted.

45. Worse, these e-scooters (sometimes multiple ones in the same location) are constantly strewn about across the sidewalk obstructing the path of pedestrians, on people's lawns, on private property, in the street where cars are supposed to park, and in the street where they pose a threat of injury to cars and pedestrians.

46. These e-scooters pose a clear hazard to both pedestrian and motor vehicle.

47. In fact, a number of politicians are now speaking out about these e-scooters.

48. Just two weeks ago, on September 12, 2024, New York City Council members Sandra Ung and Lynn C. Schulman introduced legislation to have the program banned in Downtown Flushing and other locations in Queens.

49. In a Facebook post on August 15, 2024, Councilmember Ung expressed that:

> Many of you have reached out to my office regarding the e-scooters that are appearing across Flushing, blocking sidewalks and knocked over on corners. When NYC DOT presented this to me in 2023 as a pilot project, I immediately wrote a letter expressing my STRONG opposition to this plan - you can find a picture of that letter in my post. The fact of the matter is that the sidewalks and streets of Flushing are too congested, and these scooters are only making our streets more dangerous for the thousands of pedestrians who make use of our sidewalks on a daily basis. Community Board 7 similarly expressed their strong concerns regarding this proposal. Unfortunately, NYC DOT refused to listen to community concerns and stated that they were moving forward with this ill-conceived plan. Together with CB7 and the Flushing BID, I held a press conference reiterating that this plan was not right for Flushing - you can find the press coverage at the bottom of this post. After just a few weeks, it is clear that many of our concerns were spot on. Scooters are scattered across Flushing sidewalks, creating both a nuisance and a danger to seniors, individuals with disabilities and pedestrians. I remain opposed to this plan and am introducing legislation to ban parking the scooters in Flushing.

50. In response to her post, a resident commented in Spanish: "Take them off the streets...truly very dangerous for pedestrians...especially older people."

51. This sentiment is not unique to Downtown Flushing.

52. On October 7, 2024, Speaker Adrienne Adams, the Speaker of the New York City Council (and former Chair of the Committee on Public Safety), wrote a letter to Commissioner Ydanis Rodriguez, Commissioner of the NYC Department of Transportation, stating as follows:

> Dear Commissioner Rodriguez:
>
> I am writing to express my profound concerns about the Department of Transportation's implementation of its E-Scooter Share program in Southeast Queens, due to the impact it is having on the safety of community residents. Since the program's inception, my constituents have consistently raised questions and concerns about the safety hazards created when e-scooters are frequently left on sidewalks and streets, obstructing pedestrians and all road users. The lack of orderly operation and enforcement when e-scooters are left on public streets and sidewalks with reckless abandon must be urgently addressed. I am requesting a reset of the department's E-Scooter Share program in Southeast Queens to ensure the necessary protocols and protections are enacted to prioritize the safety of all residents, while supporting local transportation needs.
>
> For months, my constituents have witnessed and shared many accounts of e-scooters being left on sidewalks and streets, as well as in front of homes, driveways, businesses, places of worship, and beyond. These obstructions of walkways and roadways have impacted residents' abilities to enter buildings and homes, cross streets, and navigate our streetscape. These conditions present potential hazards, especially to older adults and people with disabilities in neighborhoods.
>
> While e-scooters are supposed to be docked at parking corrals located throughout the service area, in reality, they are too often chaotically left scattered on public and private spaces throughout Southeast Queens. Without strong regulation and enforcement by DOT focused on the companies responsible for operating these devices, the established parking corrals are rendered ineffective and pointless. This undermines public safety and quality of life in neighborhoods. For the program to be successful, there must be clear guidelines, signage, and enforcement of these corporations to prevent e-scooters from being left in inappropriate places.
>
> As the city agency tasked with regulating and overseeing the E-Scooter Share program, DOT must take greater responsibility for monitoring the practices of the three private e-scooter companies operating in Southeast Queens: Lime, Bird, and Veo. While all stakeholders must be part of the solution, DOT should be actively leading efforts to address residents' concerns and hold the companies accountable for persistent safety issues created by their operations.
>
> There must also be robust and consistent community engagement when the City introduces a new program, like this, within a neighborhood that can impact local residents' quality of life. DOT should listen to and consider the needs of community

residents, and adjust implementation to ensure issues are quickly and sufficiently resolved.

For all these reasons and more, I am requesting a reset of this program in Southeast Queens, including an immediate operational pause in the service area to properly address these many outstanding issues. This is a necessary step to curb the dysfunctional implementation that has undermined its success to establish a rational program.

Along with my fellow elected representatives of the affected areas and community stakeholders, I look forward to working collaboratively with you and the department to help meet the transportation and safety needs of all Southeast Queens residents. I appreciate your attention to this matter, and I look forward to your response.

Sincerely,

**ADRIENNE E. ADAMS**
Speaker
New York City Council
District 28, Queens

53. Thus, it is clear that residents all over are fed up with these e-scooters, which are strewn about public and private property.

54. These e-scooters are hazardous and a public eyesore.

55. They impede the flow of pedestrian and vehicle traffic, pose a clear and present danger, and impact the ability for the elderly, disabled, and others with limited mobility from traveling unobstructed and unimpeded.

56. Today the program covers the areas in the Bronx covered by Community Boards 9-12,[4] and the areas in Queens covered by Community Boards 7-8, and 11-13[5].

---

[4] This covers Baychester, Eastchester, Edenwald, Olinville, Wakefield, Williamsbridge,,Woodlawn, Allerton, Bronxdale, Indian Village, Morris Park, Pelham Gardens, Pelham Parkway, Van Nest, Parkchester, Soundview, Unionport, Castle Hill, Clason Point, Country Club, Edgewater Park, Schuylerville, and Throggs Neck.
[5] This is the zone comprised of ~20 square miles from Flushing & Auburndale in the north to Rochdale Village & Springfield Gardens in the south

## FACTS PERTAINING TO CLASS REPRESENTATIVE PLAINTIFF

57. On September 13, 2024, Plaintiff was walking home late at night to his house in Queens.

58. Because of the late hour and lack of illumination, Plaintiff did not see or realize that there were two e-scooters strewn across the sidewalk, impeding the path.

59. As a result, Plaintiff tripped over the e-scooters, and fell to the ground.

60. Thankfully Plaintiff was able to stop himself from smashing into the sidewalk with his hands, but as a result, Plaintiff ended up scraping his hands and arms on the sidewalk, and had to endure the pain of the scrapes until his hands and arms healed.

61. Plaintiff also twisted his ankle, and was limited in his physical activities until his ankle healed.

62. Had Plaintiff not caught himself, the injury could have been substantially worse and even life-threatening had Plaintiff hit his face or head on the concrete.

63. Had that occurred, Plaintiff could have been lying unconscious or worse on the sidewalk for hours until found the next morning.

64. While thankfully that did not happen, the fact that it could have happened illustrates the extreme hazard that this public nuisance poses, especially to the elderly, disabled, and those with limited mobility, who would be the most at risk of an inability to get up or call for help in the event that they tripped and fell over one of these e-scooters.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this class action pursuant to Article 9 of the New York Civil Practice Law and Rules.

66. Certification of a class of individuals who reside in the areas of the Bronx covered by Bronx Community Boards 9-12 and the areas in Queens covered by Community Boards 7-8, and 11-13 is appropriate because: a) common questions of law and fact exist as to all members of the class, and predominate over the questions affecting only individual members; b) these areas impact more than 1.2 million residents, whose household names and addresses are identifiable based on public records, or otherwise obtainable; c) Plaintiff's claims are typical of the claims of each class member, and Plaintiff will therefore be an adequate and appropriate class representative; d) Plaintiff is an adequate representatives of the class because his interests are aligned with, and are not antagonistic to, the interests of the members of the class he seeks to represent, and Plaintiff intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of members of the class; and e) a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  Due to the nature of the cause of action being one of public nuisance, it would be impractical for the members of the class to individually redress effectively the wrongs done to them, as the costs of litigation would outweigh the potential recovery for each individual plaintiff, and therefore it would be difficult for the individual plaintiffs to even find representation. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts to have to try hundreds of thousands of cases instead of one. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised.  By contrast, the class action

device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

## AS AND FOR A FIRST CAUSE OF ACTION: PUBLIC NUISANCE

67. Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "66" inclusive, as if more fully set forth herein at length.

68. Plaintiff has suffered special damage as a result of Defendants' public nuisance, in the form of the injury to his body upon tripping over two improperly parked e-scooters that were impeding what should have otherwise been an unobstructed flow of pedestrian pathway.

69. "A public nuisance exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons." Thomas v. Trs. of the Freeholders & Commonalty of the Town of Southampton, 202 A.D.3d 858, 864, 163 N.Y.S.3d 201, 208 (2nd Dep't 2022).

70. Here the E-Scooter Defendants' negligent and reckless conduct, and knowing indifference to their users' violations of the terms of service and Defendants' requirements under the e-scooter program and their contracts with DOT/NYC constitute a public nuisance.

71. Likewise, despite its actual knowledge of the reckless disregard of the parking requirements under the e-scooter program, DOT nevertheless pushed ahead with an expansion of the program into Queens, despite vehement opposition from local leaders against the program's implementation in their area.

72. The very predictable concerns of these leaders, of which the DOT was already aware based on its pilot program in the Bronx, predictably and immediately came into fruition, and has constituted the substantial public nuisance complained of in this Complaint.

73. The negligent and reckless disregard of E-Scooter Defendants' e-scooters on private property, and in the public property in a manner in which it impedes and interferes with the unobstructed flow of pedestrian traffic, as well as motor vehicle traffic and parking, substantially interferes with the use by the public of public places.

74. It also endangers and poses a hazardous risk to the property, health, and safety of the hundreds of thousands to more than a million people to whom the conduct impacts.

75. The reckless parking and discarding of e-scooters after use on private property also constitutes a trespass.

76. The eyesore of e-scooters strewn about people's lawns, sidewalks, and streets also constitutes a nuisance that interferes with the public's right to a clean neighborhood free of unwanted materials strewn across private and public property.

77. It is audacious that the onus is then placed on the non-using public to have to report the improper scooters, even assuming that the public would know how and to whom to report the incident.

78. E-Scooter Defendants, who operate their companies for profit, had years to prepare for compliance with the requirements of Local Law 74 and their contracts with DOT/NYC.

79. Likewise, Defendant NYC, which had actual knowledge of the substantial noncompliance of the program with the law's/contracts' requirements, has not taken sufficient steps (if any) to force Defendants to comply with the law and with their contractual requirements, or to impose penalties for such noncompliance, and instead has expanded the

program to Queens despite actual knowledge of the noncompliance and threat to the rights and safety of the public.

80. E-Scooter Defendants have categorically failed in their obligation to ensure that their e-scooters are not parked or abandoned in a manner which complies with their obligations under Local Law 74 and their contracts with DOT/NYC, and all of the Defendants have categorically failed to ensure that these e-scooters do not constitute a nuisance to the public.

81. Thus, in addition to general compensatory damages, Defendants are also liable for punitive damages due to their "conscious disregard" of Plaintiff's rights and of the risk to public safety.

**WHEREFORE**, Plaintiff seeks relief against Defendants as follows:

a. An order certifying the case as a class action on behalf of the proposed class under Article 9 of the CPLR and appointing Plaintiff and the undersigned counsel of record to represent same;

b. An award of compensatory damages in an amount to be determined;

c. An award of punitive damages in an amount to be determined;

d. A permanent injunction prohibiting Defendants from continuing the e-scooter program until such time that the Defendants satisfactorily demonstrate to the elected leaders of each area to be impacted by the program that the e-scooters will not be parked or abandoned in any manner that interferes with the safety of the public or the public's right to unobstructed paths for walking and driving;

e. An award of pre-judgment and post-judgment interest as provided by law;

f. An award of attorneys' fees and costs; and

g.  Such other relief as the Court deems just and proper.

Dated: Fresh Meadows, New York
November 28, 2024

      /s/ Jonathan E. Neuman
JONATHAN E. NEUMAN, ESQ.
*Attorney for Plaintiff*
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com