UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                         :

**JOSHUA NEUMAN**, on behalf of himself and all
others similarly situated,               :

                  Plaintiff,        :

                         :   **MEMORANDUM DECISION AND**
       – against –          :   **ORDER**

                         :   24-CV-7430 (AMD) (CHK)

                         :

**BLUE JAY TRANSIT INC. d/b/a BIRD;**       :
**BLUE JAY TRANSIT USFM LLC D/B/A BIRD;**
**NEUTRON HOLDINGS, INC. D/B/A LIME;**     :
**VEORIDE, INC. D/B/A VEO;** and
**CITY OF NEW YORK**,                :

                         :

             Defendants.     :

                         :
---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this class action against the defendants Blue Jay Transit USFM LLC D/B/A Bird ("Bird"), Neutron Holdings, Inc. D/B/A Lime ("Lime"), VeoRide, Inc. D/B/A Veo ("Veo") (together, the "e-scooter defendants"), and the City of New York, alleging public nuisance in connection with shared electronic scooters in neighborhoods throughout New York City. (ECF No. 14.) The defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). As explained below, the Court grants the motions.

**BACKGROUND**

**I.    Factual Background**

    **a.  New York City's E-Scooter Share Program**

In 2020, New York legalized throttle-based bicycles and e-scooters in the state. (ECF No. 14 ¶ 9.) In July 2020, the New York City Council passed Local Law 72, which authorized e-scooters in New York City, and Local Law 74, which directed the New York City Department of

Transportation ("DOT") to establish a pilot program with selected companies operating shared e-scooter systems.  (*Id.* ¶¶ 10–11.)  Local Law 74 provided that "[a]ny shared electric scooter organizations participating in such pilot program shall be required to have in place and implement a protocol to keep paths of travel, curb ramps, and other accessibility features unobstructed for people with disabilities."  (*Id.* ¶ 13.)  Local Law 74 required DOT to submit a report on the program's progress before the end of the pilot program, and recommend a permanent shared e-scooter program, as well as suggest changes to the laws, regulations, and policies governing the use of e-scooters.  (*Id.* ¶ 14.)  In October 2020, DOT issued a Request for Expressions of Interest to identify and select companies to participate in the pilot program.  (*Id.* ¶ 15.)  DOT ultimately chose the e-scooter defendants.  (*Id.* ¶ 15.)

In August 2021, DOT launched the shared e-scooter pilot program in the East Bronx with 3,000 e-scooters.  (*Id.* ¶¶ 16–17.)  DOT expanded the program in June 2022 to more locations in the East Bronx and added an additional 6,000 e-scooters.  (*Id.* ¶ 18.)  The e-scooter defendants use a "pay-as-you-go model" — users pay $1.00 to unlock the scooter and an additional fee for each minute of use.  (*Id.* ¶ 19.)  When the users are finished, they park the scooters in either mandatory corral zones or furniture zones.  (*Id.* ¶¶ 24, 28.)  Mandatory corral zones are typically placed in dense, commercial areas to minimize sidewalk clutter.  (*Id.* ¶¶ 25–26.)  The user parks the scooter in a designated parking corral.  (*Id.*)  During the pilot program, DOT installed 130 parking corrals in the East Bronx.  (*Id.* ¶ 27.)

In less dense neighborhoods, users can park scooters on the "furniture zone" of the sidewalk, where benches, bus stops, tree pits, and parking signs are typically located at the edge of the sidewalk, next to the roadbed.  (*Id.* ¶¶ 28–29.)  Users who park in the furniture zone cannot block pedestrian paths, curb cuts, or driveways, and cannot park on private property or

2

the roadbed. (*Id.* ¶ 29.) The plaintiff alleges that the e-scooter defendants are responsible, under their agreement with DOT, for improperly parked scooters. (*Id.* ¶ 31.) The e-scooter defendants advise users about the parking rules through in-app training and community outreach events. (*Id.* ¶ 30.) The e-scooter defendants do not otherwise enforce the parking rules or monitor whether users park the scooters correctly. (*Id.* ¶¶ 30, 32.) Nor do the e-scooter defendants penalize users who do not park properly. (*Id.*) Community members who see an improperly parked scooter call the e-scooter defendants' customer service number, which is written on the scooters, or by using the Community Reporting Tool in the app or on the website. They can also call 311, the city's non-emergency customer service and information line to report an improperly parked scooter. (*Id.* ¶ 33; *see also* ECF No. 25-1 at 8.)

According to the plaintiff, this arrangement "leads to e-scooters being dumped in improper zones, in the street, and across the width of the sidewalk impeding the path for pedestrians, elderly, disabled, and others with limited mobility, for days or even weeks at a time, impeding the public's access to clean and unobstructed streets and sidewalks, and putting homeowners and business owners at risk of liability in the event that somebody trips or is otherwise injured by an e-scooter improperly parked in front of their property." (ECF No. 14 ¶ 35.) The plaintiff also asserts that the people most affected by improperly parked scooters — the elderly, disabled, and people with limited mobility — are the least likely to know whom to call to fix the problem. (*Id.* ¶ 36.) The defendants do not find out about improperly parked scooters unless someone makes a report, and they "do not endeavor to make themselves aware of improperly parked e-scooters." (*Id.* ¶ 37.) DOT received thousands of complaints during the pilot program; more than half of non-users' complaints were about scooters "blocking the right of way." (*Id.* ¶ 38.) In its final report on the pilot program, issued in November 2022, DOT

3

found that in a single year, over 86,000 riders completed over 1,000,000 trips, with an average of over 2,800 trips per day. (*Id.* ¶¶ 20–21.)[1]  In addition, DOT reported that 24 percent of inspected scooters were parked improperly, and 10 percent blocked pedestrian pathways.  (*Id.* ¶ 22.)[2]

In June 2023, DOT announced that it was expanding the e-scooter share service to 20 square miles in East Queens, affecting about 600,000 Queens residents.  (*Id.* ¶ 40.)  DOT launched the program in June 2024.  (*Id.* ¶ 41.)  From then until the plaintiff initiated this action, there were over 300,000 e-scooter users in Queens.  (*Id.* ¶ 42.)  Many users rode the scooters on the sidewalk, which was not permitted.  Moreover, scooters "are constantly strewn about across the sidewalk obstructing the path of pedestrians, on people's lawns, on private property, in the street where cars are supposed to park, and in the street where they pose a threat of injury to cars and pedestrians."  (*Id.* ¶¶ 44–45.)  Politicians have "sp[oken] out about these e-scooters."  (*Id.* ¶ 47.)  On August 15, 2024, New York City councilmember Sandra Ung expressed concerns about the program on Facebook.  A resident posted the following comment: "Take them off the streets . . . truly very dangerous for pedestrians . . . especially older people."  (*Id.* ¶¶ 49–50.)  About a month later, councilmembers Ung and Lynn C. Schulman introduced legislation to ban the program in downtown Flushing and in other Queens locations.  (*Id.* ¶ 48.)  On October 7, 2024, New York City Council Speaker Adrienne Adams wrote to DOT Commissioner Ydanis Rodriguez "to express [her] profound concerns about the Department of Transportation's implementation of its E-Scooter Share program in Southeast Queens, due to the impact it is

---

[1] Since the launch of the pilot program in August 2021, until May 2024, there were approximately 3.8 million trips and more than 157,000 user accounts in the Bronx.  (ECF No. 14 ¶ 39.)

[2] According to the plaintiff, "[a]ssuming that the DOT inspections were a representative sample of the entirety of the program," during the one-year period there were over 240,000 improperly parked scooters and 100,000 instances of e-scooters blocking pedestrian pathways.  (*Id.* ¶ 23.)

having on the safety of community residents." (*Id*. ¶ 52.)  As of the date the plaintiff initiated this action, the program covered areas in the Bronx and Queens.  (*Id*. ¶ 56.)

### b.  The Plaintiff's Injuries

In the late evening of September 13, 2024, the plaintiff was walking to his house in Queens.  He did not see two e-scooters "strewn across the sidewalk, impeding the path."  (*Id*. ¶¶ 57–58.)  He tripped over them and fell to the ground.  (*Id*. ¶ 59.)  He "was able to stop himself from smashing into the sidewalk," but scraped his hands and arms on the sidewalk, and "had to endure the pain of the scrapes until his hands and arms healed."  (*Id*. ¶ 60.)  He also twisted his ankle, and "was limited in his physical activities until his ankle healed."  (*Id*. ¶ 61.)  The plaintiff maintains that "the injury could have been substantially worse and even life-threatening" if he had "hit his face or head on the concrete," which could have left him "lying unconscious or worse on the sidewalk for hours until found the next morning."  (*Id*. ¶¶ 62–63.)

## II.    Procedural History

The plaintiff brought this action in Queens County Supreme Court on behalf of himself and others similarly situated on September 30, 2024.  (ECF No. 1-1.)  On October 24, 2024, the defendants removed the action to federal court pursuant to the Class Action Fairness Act of 2005 (CAFA), Pub. L. No. 109-2, 119 Stat. 4 (2005).  (ECF No. 1.)[3]  On November 28, 2024, the plaintiff filed an amended complaint.  (ECF No. 14.)  The plaintiff asserts one cause of action for public nuisance.  He asserts that the e-scooter defendants' "negligent and reckless conduct, and knowing indifference to their users' violations of" the scooter program rules "constitute[s] a

---

[3] This statute grants federal courts diversity jurisdiction over putative class actions that (1) were commenced after February 18, 2005; (2) have minimal diversity; (3) have 100 or more class members; and (4) have an aggregate amount in controversy over $5,000,000.  *See* 28 U.S.C. §§ 1332 note, 1332(d)(2)(A), 1332(d)(5)(B), 1332(d)(6).

public nuisance." (*Id.* ¶ 70.) He further alleges that "despite its actual knowledge of the reckless disregard of the parking requirements under the e-scooter program, DOT nevertheless pushed ahead with an expansion of the program into Queens, despite vehement opposition from local leaders against the program's implementation in their area." (*Id.* ¶ 71.) He says that "[t]he negligent and reckless disregard of E-Scooter Defendants' e-scooters on private property . . . impedes and interferes with the unobstructed flow of pedestrian traffic, as well as motor vehicle traffic and parking" and "poses a hazardous risk to the property, health, and safety" to more than a million people. (*Id.* ¶¶ 73–74.) In addition, he asserts that the "reckless parking and discarding of e-scooters . . . on private property . . . constitutes a trespass," and that e-scooters "strewn about people's lawns, sidewalks, and streets also constitutes a nuisance that interferes with the public's right to a clean neighborhood." (*Id.* ¶¶ 75–76.) He says that he "has suffered special damage . . . in the form of the injury to his body upon tripping over two improperly parked e-scooters that were impeding what should have otherwise been an unobstructed flow of pedestrian pathway." (*Id.* ¶ 68.)

The plaintiff seeks compensatory and punitive damages, and a permanent injunction prohibiting the defendants from continuing the e-scooter program until they "satisfactorily demonstrate to the elected leaders . . . that the e-scooters will not be parked or abandoned in any manner that interferes with the safety of the public or the public's right to unobstructed paths for walking and driving." (*Id.* at 14.) He also asks for pre-judgment and post-judgment interest, and attorneys' fees and costs. (*Id.*) On March 27, 2025 the defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 24, 25.)

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Pleadings are construed in the light most favorable to the plaintiff. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

**DISCUSSION**

"A public nuisance under New York law exists when there is a substantial interference with a public right." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 390 (E.D.N.Y. 2004). "It is uncontested that the historical purpose of the doctrine of public nuisance was primarily to protect the public from harm or danger; the same is equally true of the modern tort of public nuisance." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 481 (E.D.N.Y. 2003). A public nuisance is "an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 568 (1977). Thus, the "State has standing to bring actions for public nuisance as a matter of course in its role as 'guardian of the environment.'" *Chase Manhattan Bank, N.A. v. T & N PLC*, 905 F. Supp. 107, 125 (S.D.N.Y. 1995) (quoting *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir. 1985)); *see also S. Buffalo Dev., LLC v. PVS Chem. Sols., Inc.*, 675 F. Supp. 3d 320, 325 (W.D.N.Y. 2023) ("Harms that are experienced by the public at large are generally

7

remedied, on behalf of the public, by state regulation and enforcement.").  Nevertheless, private parties can sue for public nuisance if they allege (1) "the existence of a public nuisance—a substantial interference with a right common to the public;" (2) "negligent or intentional conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance;" and (3) a special injury, which is a "particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of that public nuisance." *N.A.A.C.P.*, 271 F. Supp. 2d at 448.

All defendants argue that a plaintiff cannot bring a public nuisance claim for activities that the state authorizes (ECF No. 24 at 11–12; ECF No. 25-1 at 13–15), and that the plaintiff has not pled a "special injury." (ECF No. 24 at 14–16; ECF No. 25-1 at 14, 17–19.)  They also claim that the plaintiff has not adequately alleged causation: the City says that it did not proximately cause the plaintiff's injury; the e-scooter defendants say that they cannot be liable for the conduct of third-party actors, and that the complaint does not identify which scooter company caused the plaintiff's injury. (ECF No. 24 at 13–14; ECF No. 25-1 at 15–17.)  The City asserts that the plaintiff has not pled a "substantial interference with the exercise of a common right to the public" and cannot bring what is really a personal injury claim as a nuisance claim. (ECF No. 24 at 11–12.)

The Court addresses the causation question first.  The City argues that the plaintiff's only allegation against the City is his "conclusory" assertion that "the City is liable for the public nuisance based upon 'its actual knowledge and reckless disregard of the parking requirements under the e-scooter program.'" (ECF No. 24 at 13–14 (*quoting* ECF No. 14 ¶ 71).)  The e-scooter defendants argue that the plaintiff does not sufficiently connect them to his injuries; instead, he "points to an unidentified, unknown third-party actor by merely alleging" that he

tripped and fell because there were "two e-scooters strewn across the sidewalk." (ECF No. 25-1 at 15–16 (quoting ECF No. 14 ¶ 58).) In addition, they say that they cannot be liable for the conduct of riders — who are not alleged to have worked for the defendants — who left the scooters where the plaintiff fell over them. (*Id.* at 16.)

The plaintiff responds that under New York City's Administrative Code, the City is responsible for abating public nuisances, and is liable when it does not do so. (ECF No. 29 at 16–20.) As for the identities of the company or companies that owned the offending scooters, the plaintiff says that he does not need to be specific; according to the plaintiff, all the e-scooter defendants "are engaged in the public nuisance activity complained of" and "allow their scooters to be strewn about in the public sidewalk and on private property." (ECF No. 30 at 16.) Moreover, he argues, the defendants can be liable for their customers' conduct, because they "introduced this conduct and commercial activity into the area" and "are aware of their customers' unlawful conduct, and yet allow their customers to engage in this nuisance conduct without consequence." (*Id.* at 18.)

To state a claim against the City for public nuisance, a plaintiff must allege that the City's conduct was a proximate cause of the claimed public nuisance. *See Janki Bai Sahu v. Union Carbide Corp.*, 528 F. App'x 96, 101 (2d Cir. 2013) ("New York's First Department has cautioned that courts are not to lay aside traditional notions of remoteness, proximate cause, and duty when evaluating public nuisance claims."). The plaintiff has not alleged a causal connection between the defendants' conduct and the alleged public nuisance.

In *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of New York, L.L.C.*, the complaint alleged that the City and Waste Management of New York (WMNY) contracted to dispose of waste in a landfill, and that WMNY was required to ensure that the agreement did not create

"nuisance conditions." 405 F. Supp. 3d 408, 446 (W.D.N.Y. 2019). The complaint also alleged that the City was significantly involved in the project: the City could "direct changes to the WMNY operating schedule," WMNY had to report violations to the City immediately, the City's shipment of waste "coincided with" WMNY's decision to not install tools to mitigate odors, and the odors escalated when WMNY began receiving waste from the city. *Id.* Under these circumstances, "NYC's actions cannot be discounted as 'the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did.'" *Fresh Air*, 405 F. Supp. 3d at 446 (quoting *United States v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960, 968 (W.D.N.Y. 1989)). Accordingly, the court found that "at least at this early stage, Plaintiffs have plausibly alleged that NYC's conduct is a proximate cause to a public nuisance." *Id.*

The plaintiff's allegations about the City are not comparable to the allegations in *Fresh Air for the Eastside*. Aside from alleging that the City established and reported on the pilot program, the plaintiff has not alleged that the City did anything to cause the specific nuisance about which he complains. (*See, e.g.*, ECF No. 14 ¶¶ 13–14, 20.) He claims that the City is liable based on its "actual knowledge of the reckless disregard of the parking requirements under the e-scooter program" and because it did not "force [the e-scooter defendants] to comply with the law and with their contractual requirements." (*Id.* ¶¶ 71, 79.) But he also alleges that the e-scooter companies, not the City, were responsible for making sure that the scooters did not block pedestrian paths. (*Id.* ¶ 13.) These allegations do not establish that the City "played a sufficiently direct role in causing" the conduct about which the plaintiff complains. *Janki Bai Sahu*, 528 F. App'x at 101.

10

The plaintiff does not identify which company owned the scooters that caused him to fall, a deficiency that requires dismissal. In *Chiapperini v. Gander Mountain Co.*, 48 Misc. 3d 865, 878–79 (N.Y. Sup. Ct. 2014), the court compared Chiapperini's allegations — which the court found sufficient — to the allegations in another case, *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (2001). There, relatives of individuals killed by handguns sued multiple handgun manufacturers, but "could not identify the actual gun manufacturer." 48 Misc. 3d at 879. Thus, "there was no direct link" to the gun manufacturer defendants. *Id.* In *Chiapperini*, on the other hand, it was "uncontested" that the defendant sold the gun to and interacted with the person who killed someone with the gun. *Id.* The court found that those factual allegations were sufficient to state a public nuisance claim against the gun manufacturer. *Id.* at 879.

The plaintiff cites *City of Rochester v. Premises Located at 10-12 S. Washington St.*, but that case is different. There, the court found that a nightclub owner could be held liable for "off-premises conduct of their (former) patrons," because the "establishment of the night club . . . introduced this conduct into the area." 180 Misc. 2d 17, 21–22 (N.Y. Sup. Ct. 1998) (citation omitted). But there was no question that the patrons of the nightclub created the public nuisance. *See id.* at 18 (noting that the police department sent officers to the nightclub at closing time to help disperse "large disorderly crowds of patrons," and that the club did not dispute that several incidents "actually occurred").

The analysis in *Hamilton* applies here. The plaintiff alleges that he tripped over "two e-scooters strewn across the sidewalk, impeding the path" (ECF No. 14 ¶ 58), but does not say which defendant owned the scooters. Rather, he assumes that the scooters belonged to "one or two" of the e-scooter defendants (ECF No. 30 at 16). That is not sufficient to hold all companies liable. Moreover, the defendants are not the only entities in New York permitted to own e-

11

scooters. Under New York law "natural person[s]" can also own e-scooters (*see* ECF No. 33 at 10 (citing Vehicle and Traffic Law § 1282(7)(b))). The plaintiff has pled no facts to connect the e-scooter defendants to the e-scooters that caused his injury.[4] And he cites no authority for the propositions that the causal nexus is a general one — that the e-scooter defendants must be collectively liable, even if they did not own the scooters at issue, because they "failed to prevent their users from improperly parking the scooters and . . . to take action against users who improperly park." (ECF No. 30 at 16–19.) The law requires a plaintiff to show that the defendant actually caused the special injury, a requirement that "guard[s] against [a] multiplicity of lawsuits." *532 Madison Ave. Gourmet Foods*, 96 N.Y.2d at 292.[5]

---

[4] The only injury the plaintiff alleges that is sufficient to constitute a special injury is that he "tripped over the e-scooters, and fell to the ground," "ended up scraping his hands and arms on the sidewalk," and "twisted his ankle." (ECF No. 14 ¶¶ 59–61.) *See Kilmer v. 99 John's Mkt. Place Inc.*, 198 N.Y.S.3d 865, 870 (N.Y. Sup. Ct. 2023) ("In demonstrating that he suffered personal injuries, he has pled a special injury that is different in kind from the mere inconvenience suffered by the community at large, to wit a narrower public space for pedestrians to walk."); *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 392 (E.D.N.Y. 2004) ("Physical injuries to particular persons are generally sufficient to constitute harm different in kind under New York law."); Restatement (Second) of Torts, § 821C cmt. d) ("When the public nuisance causes personal injury to the plaintiff . . . the harm is normally different in kind from that suffered by other members of the public and the tort action may be maintained."). The plaintiff's allegations that "the injury could have been substantially worse and even life-threatening had Plaintiff hit his face or head on the concrete" and that he "could have been lying unconscious or worse on the sidewalk for hours until found the next morning," (ECF No. 14 ¶¶ 62–63), are entirely speculative. The other injuries the plaintiff alleges — "interfere[nce] with the unobstructed flow of pedestrian traffic," "risk to the property, health, and safety" of pedestrians, and "the eyesore of e-scooters" (*id.* ¶ 73–74, 76) — are not "different in kind" from injuries common to the public. *See, e.g.*, *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 294 (2001) ("[E]very person who maintained a business, profession or residence in the heavily populated areas of Times Square and Madison Avenue was exposed to similar economic loss during the closure periods."); *Golden v. EcoHealth All., Inc.*, 241 A.D.3d 1198, 1199 (1st Dep't 2025) ("[I]n a case like this, in which the public nuisance alleged consists of the creation and release of a novel virus, physical injuries resulting from infection therewith (although differing in degree) are of the same kind suffered by all who are affected.").

[5] The Court does not find the defendants' other arguments persuasive. The Court does not need to decide whether, as a general rule, a plaintiff can bring a public nuisance claim for activities that the state authorizes, because the e-scooter share program did not authorize users to violate parking rules; indeed, the program proscribes the conduct that is the subject of the plaintiff's complaint — parking e-scooters in a way that blocks pedestrian paths of travel. *See, e.g.*, *Landau v. City of New York*, 180 N.Y. 48, 53 (1904) (finding that an explosion of fireworks was a public nuisance, because although in "certain states the city is held not liable" for an explosion of fireworks in a public street, the "law in our own state was established the other way by a decision of this court"). In addition, the plaintiff sufficiently pleads a

The e-scooter share program is a product of New York state and city legislative and regulatory decisions. Thus, the legislature is the proper forum to address complaints and criticisms about the program. *See People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 194–95 (1st Dep't 2003) (dismissing public nuisance action against gun manufacturers because "the Legislative and Executive branches are better suited to address the societal problems concerning the already heavily regulated commercial activity at issue"). Indeed, as the plaintiff points out in the complaint, elected officials have weighed in on the program. (*See* ECF No. 14 ¶ 49 ("In a Facebook post on August 15, 2024, Councilmember Ung expressed that . . . 'I remain opposed to this plan and am introducing legislation to ban parking the scooters in Flushing.'"); *id.* ¶ 52 ("Along with my fellow elected representatives of the affected areas and community stakeholders, I look forward to working collaboratively with you and the department to help meet the transportation and safety needs of all Southeast Queens residents.").)

---

substantial interference with a public right. *See Kilmer*, 198 N.Y.S.3d at 869 ("New York courts recognize that the unlawful obstruction of a public street may be considered a public nuisance."). The City's challenges to the plaintiff's statistics raise factual questions that cannot be resolved on a motion to dismiss. *See Guzman v. News Corp.*, No. 09-CV-9323, 2010 WL 11668061, at *1 (S.D.N.Y. Sept. 27, 2010) ("These issues, however, all present factual questions that are inappropriate to decide on a motion to dismiss."). The Court does not address the e-scooter defendants' additional argument that the plaintiff is trying to enforce an agreement between them and the City, an agreement of which the plaintiff is not a third-party beneficiary. (*See* ECF No. 25-1 at 19–21.)

## CONCLUSION

For these reasons, the defendants' motions to dismiss are granted and the complaint is dismissed without prejudice. The Clerk of Court is respectfully directed to enter judgment and close the case.

**SO ORDERED.**

                                       ___s/Ann M. Donnelly_____
                                         ANN M. DONNELLY
                                         United States District Judge

Dated: Brooklyn, New York
        February 9, 2026